Page 1

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLORADO
2   CIVIL ACTION NO. 05-CV-02533-EWN

3   _____

    DEPOSITION OF:  DAVID PLATT
4   EXAMINATION DATE:  July 19, 2006

**EXHIBIT**

**A-1**

5   _____

    THOMAS MONTOYA,
6
    Plaintiff,
7
    v.
8
    BOARD OF COUNTY COMMISSIONERS, CHAFFEE COUNTY,
9   COLORADO, in their official and individual
    capacities; CHAFFEE COUNTY SHERIFF TIMOTHY
10  WALKER, in his official and individual capacity;
    CHAFFEE COUNTY DEPUTY SHERIFF SCOTT GLENN, in his
11  official and individual capacity; DAVID PLATT, in
    his official and individual capacity; BOARD OF
12  COUNTY COMMISSIONERS, PARK COUNTY, COLORADO, in
    their official and individual capacities; PARK
13  COUNTY SHERIFF FRED WEGENER, in his official and
    individual capacity,
14
    Defendants.
15  _____

16          PURSUANT TO NOTICE, the deposition of
    DAVID PLATT was taken at 1:12 p.m. on July 19,
17  2006, at 1543 Champa Street, Suite 400, Denver,
    Colorado, before Lisa Persichitte Reed,
18  Registered Professional Reporter and Notary
    Public in and for the State of Colorado, said
19  deposition being taken pursuant to the Federal
    Rules of Civil Procedure.
20
21
22          Lisa Persichitte Reed
          Registered Professional Reporter
23
24
25

Page 14

1          A       That is a no, I am not.

2          Q       So is it fair to say Chaffee

3    County was one of your clients?

4          A       Yeah, mm-hmm.  I was an

5    independent contractor with them, so yes.

6          Q       For any other purpose other than

7    the TASER training?

8          A       Not that I recall, no.  That was

9    just it.  They hired me on an independent

10   contractor basis to provide TASER training to the

11   deputies at the jail that were employed there at

12   the time.

13         Q       Okay.  Let me start here.  How

14   did you develop a relationship with TASER

15   International as one of their trainers?

16         A       I developed an interest in the

17   TASER because I saw a potential need in my

18   business with the bail bonding aspect of the

19   business and the occasional bail enforcement that

20   I need to do when somebody misses court and they

21   need to bring them back.  They are not always

22   happy to have that happen to them.  So I saw a

23   need to be able to protect myself for

24   self-defense purposes with something other than

25   lethal force.  I wanted a nonlethal-force type of

Page 25

1    place in October of '03?

2              A    Okay.

3              Q    Mid-October?

4              A    I misspoke.  I'm sorry.

5              Q    Well, were you a certified TASER

6    instructor at that time?

7              A    At the time of the --

8              Q    At the time -- on October 16,

9    2003, were you a certified TASER instructor?

10             A    Yes, sir, very much so.

11             Q    Okay.  So then that means you

12   would have been certified --

13             A    Prior to that, yes.

14             Q    Do you have any idea when it was?

15             A    You know, it might have been

16   2002, now that I think about it.  The documents

17   that I submitted regarding my training and

18   materials from TASER included copies of my

19   TASER -- my training certificate.  So they should

20   be on file.

21             Q    Okay.  So you think it would be

22   late 2002 or early 2003?

23             A    Yes, I do.

24             Q    I think I have those documents.

25   I just don't know if I want to go through them or

1    of -- I'll go through them one by one.

2              (Deposition Exhibit 3 was marked.)

3              Q     (BY MR. KRZYSTEK)   Do you

4    recognize this document?

5              A     Yes.

6              Q     What is it?

7              A     This is an invoice for training

8    provided by myself and the business I was

9    operating under at the time to Lieutenant Nick

10   Leva.

11             Q     Okay.  And specifically, it's an

12   invoice for TASERrelated training; is that right?

13             A     Yes, it is.

14             Q     It indicates four students at $30

15   a student.  Was that the agreed-upon rate?

16             A     Yes, it was.

17             Q     And then 16 TASER cartridges,

18   four per student, at 17.50 each.  Were you paid

19   $400?

20             A     Yes, I was.

21             Q     By Chaffee County?

22             A     Yeah, I believe so.  I'm sorry.

23   I don't have the copy of the check.  I'm guessing

24   it's somewhere in the files, but maybe not.  The

25   bill was paid and I filed the invoice, my copy of

1    the invoice.

2           Q      Is this an invoice that you

3    created?

4           A      Yes.

5           Q      And then you submitted it to

6    Chaffee County?

7           A      Yes, I did.

8           Q      Were you the one that stamped it

9    paid once you got paid?

10          A      No, that is not a stamp of mine.

11          Q      That was -- to your

12   understanding, is that a Chaffee County stamp?

13          A      That would be my guess, yes, sir.

14          Q      All right.  Tell me how you got

15   to be selling Chaffee County TASER cartridges.

16          A      As a student enrolls in class,

17   they not only are trained on how to use the

18   thing, but again, as I indicated earlier, how to

19   load and reload and change the cartridges.  They

20   are actually required to shoot the TASER four

21   times into a target, into an aluminum-faced paper

22   target that will show the current, basically, the

23   pulses in a blue light on the target.  So they

24   have to shoot the TASER four times for

25   qualification and to pass the practical part of

```
 1   the class for TASER certification.

 2           So I purchased those on my own based on

 3   the number of students that were going to be

 4   attending the class.

 5           Q    Okay.  So you are not supplying

 6   Chaffee County with TASER ammunition.  These are

 7   cartridges that are actually used in the

 8   training?

 9           A    That's correct, yes.

10           Q    This invoice is dated August 28,

11   2003.  I think you testified earlier that the

12   first class you gave to Chaffee County deputies

13   was approximately a month before this incident.

14   To the best of your recollection, would this have

15   been the first class that you taught at the

16   Chaffee County jail?

17           A    Best of my recollection, I would

18   agree, yeah, four students.  That's about right.

19           Q    Okay.  Let me give you what will

20   be Exhibit 4.

21           (Deposition Exhibit 4 was marked.)

22           Q    (BY MR. KRZYSTEK)  Okay.  Do you

23   recognize this document?

24           A    Similar type of invoice,

25   generated on my computer for another one of the
```

1   classes.  Let's see, TASER class training for

2   September, mm-hmm.

3             Q      So it looks like you trained

4   another student on September 4, 2003?

5             A      Yes.

6             Q      Does that sound right?

7             A      Yes.

8             Q      Okay.  Why did you buy four TASER

9   cartridges for one student?

10            A      Because, as I indicated a moment

11  ago, each student shoots four cartridges to

12  qualify.

13            Q      Oh, I'm sorry.  I misread that.

14  You are right.  I'll give you Exhibit 5.

15            (Deposition Exhibit 5 was marked.)

16            Q      (BY MR. KRZYSTEK)  Do you

17  recognize that invoice?

18            A      Yes.  This is another invoice for

19  training.

20            Q      And it looks like it's dated the

21  same date, but this one has five students?

22            A      Yes, it does.

23            Q      Do you recall that?

24            A      Mm-hmm.

25            Q      These both appear to be for a

1    TASER training class on September 4, 2003.  Do

2    you see that?

3              A      Invoice date, September 4;

4    training date, September 4; training date,

5    September 4, yes, sir.

6              Q      Do you have any idea why these

7    are broken out into two separate invoices?

8              A      I don't recall.  It seems to me

9    there was one student that -- I don't know.  I

10   don't want to speculate.  I'm sorry.  One student

11   that --

12              MR. MEINSTER:  Excuse me.  Don't

13   speculate.

14              Q      (BY MR. KRZYSTEK)  If you don't

15   know, you --

16              A      I don't know.

17              Q      Do you recall who any of these

18   students were?

19              A      Again, not to be evasive, sir,

20   there is a list of the students you should have

21   in the documents I have provided.

22              Q      In the documents you provided to

23   me in response to my interrogatories?

24              A      There should be a list of the

25   students that have taken the class.

1          (Deposition Exhibit 6 was marked.)

2          Q     (BY MR. KRZYSTEK)   I'll give you

3    what we marked as Exhibit 6.   Do you recognize

4    that invoice?

5          A     This one is dated -- invoice date

6    is 11/2 for class training date 16 October, six

7    students.   Yes, sir, I generated that one.

8          Q     This would have been the class

9    with Tommy Montoya in it, correct?

10         A     Training date 16 October, I

11   believe that is correct.

12         Q     Not that Tommy Montoya was

13   necessarily a student in the class, but the date

14   of this course was the date of the allegations in

15   this complaint?

16         A     That's my understanding, yes,

17   sir.

18         Q     Do you recall who the six actual

19   students were?

20         A     I believe there was a Rick

21   Holland, H-o-l-l-a-n-d; there was a Debra Cole,

22   C-o-l-e; Scott Glenn.   Those are the only ones I

23   can recall for sure.   There were others,

24   obviously, but I don't remember without looking

25   at the file again.

Page 49

1    student?

2              A      Correct.

3              Q      There would have been 24

4    cartridges?

5              A      If I had planned on six students

6    and one didn't show and I believe that was the

7    case, then there would have been 24 cartridges

8    and I would have had four left over because there

9    were only five students that day in attendance.

10             Q      And the projection screen was for

11   purposes of showing the TASER International

12   training videos?

13             A      Correct, and my laptop.

14             Q      Which controls the projection

15   screen or for --

16             A      Well, I had a PowerPoint

17   projector as well that was operating from my

18   laptop.

19             Q      What is a PowerPoint projector?

20             A      An LCD projector.

21             Q      Which is different than the

22   screen?

23             A      Well, the screen is what I

24   projected the images on.

25             Q      I see.

Page 50

1        A       Okay.

2        Q       Okay.

3        A       Older terminology.  I'm dating

4    myself.

5        Q       Were you wearing a uniform?

6        A       No, sir.

7        Q       What were you wearing?

8        A       Well, I have a shirt that has

9    "TASER" on it, a polo shirt, a golf shirt and

10   some khaki pants, but not a uniform, not BDUs or

11   anything like that, no, sir.

12       Q       A golf shirt with TASER's logo on

13   it and khaki pants?

14       A       Yeah, I believe that is what I

15   was wearing.

16       Q       Were you armed?

17       A       No, sir, not in the jail.

18       Q       Okay.  How did you start the

19   class?

20       A       I welcomed people to the class,

21   thanked them for coming.  Once I was set up and

22   ready to go, I kind of went around and went

23   around the room in case there were people that

24   didn't know each other, might have had them

25   introduce themselves, something like that.  And

1   then I explained briefly what was going to happen

2   that day.

3           And I know there is a lot of

4   apprehension among the officers if they've never

5   experienced physically the TASER jolt.  So I try

6   and get that aspect of the class out of the way

7   early on so that people can concentrate on the

8   rest of the material I'm presenting and on the

9   material that's being presented on the screen

10  from the PowerPoint, from the disk, the training

11  disk.

12          So it wasn't long after that that I

13  said, "Okay.  Does anybody have any problem with

14  this as far as experiencing the actual TASER?"

15  I didn't recall any problems being mentioned.

16  Everybody was apprehensive.  They had never done

17  it before, but everybody was going to volunteer

18  to do this.  And I explained to them, as I did

19  previously in classes and as per TASER's policy

20  and practices and procedures, this is not a

21  mandatory thing.  This is strictly voluntary.

22  And if anybody does not want to experience it for

23  whatever reason, that's perfectly fine.

24          So everybody was basically on board to

25  do this.  So we got started with the tasing

Page 67

1          Q    Okay.  But you do agree that this

2     waiver, in any event, should be signed by

3     volunteers before being subjected to a TASER

4     shock, right?

5          A    Agreed.

6          Q    It doesn't just apply to

7     deputies, does it?

8          A    It does not.

9          Q    And you agree that it should

10    apply to Thomas Montoya as well as anyone else

11    volunteering to be shot with a TASER gun.  Do you

12    agree?

13         A    I agree.

14         Q    Your testimony is it just didn't

15    get done because you were in a hurry to get the

16    class rolling on?

17              MR. MEINSTER:  That is not what

18    he testified to.

19         A    No.  I was in -- I was focused on

20    keeping to the time schedule that I was allotted

21    and maintaining a focus on the class and the

22    material being presented.

23         Q    (BY MR. KRZYSTEK)  Have you ever

24    tasered an inmate before?

25         A    Never.

1    my briefcase, and we continue with the class and

2    getting ready for setting up for the actual

3    physical experience of being tased.

4              Q     You collected them?

5              A     Yes, I did.

6              Q     Do you recall if anyone had any

7    specific questions about any provision in the

8    release?

9              A     No, nothing that sticks out that

10   was of concern to anybody, no.

11             Q     Okay.  So then you collect the

12   waivers.  You put them in your briefcase.  And

13   then you are going to start the demonstration?

14             A     Yeah.

15             Q     Okay.  How did you -- my

16   understanding is that you paired deputies up?

17             A     Correct.

18             Q     How did you decide who gets

19   paired with who?

20             A     Just let them decide, basically,

21   who wants to go with who, who wants to be first.

22   "Oh, I'll wait and see what happens," and other

23   people are "I want to get it over with."

24             Q     So apparently, somebody stepped

25   up at some point?

Page 77

1          A      Okay.  I would have brought along

2     an expended cartridge with the cables kind of

3     wrapped up, coiled up to keep them from tearing

4     and breaking.  And I would have removed the

5     actual point, the barb off the end of the probe

6     for safety.  And I would have at that point in

7     time taped the probe to part of the first

8     person's body or shirt, pant leg.  And then the

9     second probe, to complete the connection, to the

10    second person's body.

11         Q      Do they interlock arms?

12         A      May I?  In an example like this,

13    basically like this (indicating).

14         Q      So one probe would go on one

15    deputy's left arm and the other probe would go on

16    the other deputy's right arm?

17         A      Or leg or belt, near the belt

18    area, yeah.  There is no preferred -- no wrong

19    way to do it.

20         Q      Okay.  Who pulls the trigger on

21    the TASER gun?

22         A      That would be me.

23         Q      In each case?

24         A      Yes.

25         Q      At the time that the first couple

1          A      Yes.

2          Q      How much time passed between the

3    first set of two and the second set?

4          A      Five to ten minutes maximum, I

5    would guess.  That would be it.

6          Q      Is there a table in the middle of

7    this room?

8          A      There was a table in the room,

9    yes.

10         Q      So where did you do the

11   demonstration so that nobody --

12         A      Thank you.  We moved the chairs

13   off to the side from one of the sides of the

14   tables, moved the table up against the wall.  And

15   I had an inflate-a-bed, a full-sized bed that was

16   an air bed that I inflated with a vacuum cleaner

17   that I brought, a small handheld.  I put it down

18   in the open area of the room, up against the

19   wall, and had some kind of pad or blanket or

20   something in front of that for the fellows and

21   ladies to kneel on in front of this air bed.

22             And the spotters were on the sides and

23   back of each of the teams, of each of the pairs,

24   so that we could assure that -- because we never

25   know which way they are going to go, but based on

Page 80

1    the reaction that it has -- everybody is

2    different.  So reactions are different.  So we

3    just would have ensured their safety by making

4    sure that they went forward into the air bed

5    rather than backwards onto the floor.

6              Q    And how long of a TASER shock did

7    you administer?

8              A    One to one and a half seconds max

9    would have been it.  Basically, as long as it

10   takes to pull the trigger on the TASER gun and

11   activate the safety to cut off the pulse.

12             Q    And that was true for the first

13   and second set?

14             A    Yes.  They don't need the full

15   ride unless they volunteer for the full ride.  So

16   nobody really wanted to, so if you are going to

17   do it, then let's just make it quick and that way

18   you'll have a taste of it and you'll understand

19   what it's all about.

20             Q    "Full-ride" being five seconds?

21             A    That's correct.

22             Q    So it will go for five seconds

23   unless you stop it short of that?

24             A    Correct.

25             Q    All right.  After the one or one

1    observing or volunteering as a spotter for the

2    second time.

3              Q       Did the first team have spotters?

4              A       Mm-hmm.

5              Q       The other three deputies that

6    were in there?

7              A       Mm-hmm, yeah.

8              Q       So then you shocked the second

9    couple?

10             A       Correct.

11             Q       And again, after that shock, then

12   did Montoya or one of the other inmates make his

13   presence known to you?

14             A       I don't believe it was at that

15   point, no, sir.

16             Q       Okay.  So then after the second

17   pair got tased, I assume they began to collect

18   themselves and you take the probes off of them

19   and they get reseated, right?

20             A       Yes.

21             Q       And then there is one deputy

22   left, Scott Glenn, right?

23             A       Yes.

24             Q       What were your thoughts when he

25   is the only one left?

Page 87

1        Q       (BY MR. KRZYSTEK)   What was your

2   reaction to Tommy Montoya coming into the class

3   and volunteering to get tasered?

4        A       I believed he was truly curious.

5   He indicated his curiosity about what it was

6   going to feel like and comparing it to -- and

7   being able to compare it to his previous

8   experience with a stun belt.  He was another one

9   of the volunteers out of many, many across the

10  country.  And that was about it.

11       Q       But your other volunteers were

12  all law enforcement personnel, weren't they?

13       A       In my case, they were.  Across

14  the country, that is not the case.

15       Q       What do you mean?

16       A       Newspaper people, reporters,

17  media types often agree to do this because they

18  are writing a story and they want to feel what it

19  is like as well.  So any number of reasons.

20       Q       Well, you didn't have any

21  information that inmates volunteered to be

22  tasered, did you?

23       A       No, I did not.

24       Q       Did you ever have any discussion

25  with is it Sheriff Walker, Chaffee County jail,

Page 88

1    or Leva about TASERing inmates?

2              A     No, I did not.

3              Q     Did it cross your mind to ask

4    some supervisory personnel at Chaffee County

5    before TASERing other inmates?

6              A     No, it did not.

7              Q     So Tommy Montoya's seeming

8    willingness to subject himself to a TASER shock

9    was enough for you to let him do it?

10             A     In that context, with the safety

11   precautions we had set up and spotters, you bet,

12   yeah.

13             Q     Okay.  Did you talk to him about

14   anything before TASERing him?

15             A     "Are you sure?  Are you sure you

16   want to do this?"  That was about the extent.

17             Q     You asked him if he was sure?

18             A     I likely would have, yeah.  I

19   don't recall particularly asking him, but it

20   doesn't seem like me not to.  I mean, I asked the

21   other guys, "Are you sure you want to do this?

22   You don't have to.  You are not required to."

23             Q     What about Glenn?  Did Glenn talk

24   to Montoya?

25             A     Not that I recall, no.

Page 90

1    recollection.

2            Q      He never walked into the room?

3            A      Not that I recall.

4            Q      What about the other inmates or

5    trustees that you said might be standing around?

6            A      No, they didn't come in either.

7            Q      But they were still standing

8    there?

9            A      I believe they were, mm-hmm.

10           Q      How did you -- tell me again the

11   process you went through to taser Montoya and

12   Glenn?  Did you use the same procedure attaching

13   the probes?

14           A      Very much so, yeah.

15           Q      Okay.  And how long was the TASER

16   shock that you administered to Montoya and Glenn?

17           A      Again, one to one and a half

18   seconds maximum.

19           Q      Okay.  What happened?

20           A      They fell forward into the air

21   bed that I had on the floor.  They were on their

22   knees already, to decrease the distance that they

23   needed to fall because they would fall.  So they

24   were already on their knees and I hooked them up,

25   the quick jolt.  They fell forward.  Both guys

1   got up.  I unhooked them.  Tere was jocularity

2   going around the room, laughing about the

3   experience, and "That's a sun of a gun," but that

4   was it, just --

5           Q      And then what happened?

6           A      Then what happened?  I continued

7   with the class after Mr. Montoya left the room

8   because he had other things to get back to, I'm

9   guessing.

10          Q      Okay.  Did he leave voluntarily?

11          A      Yeah.

12          Q      What did he say after you took

13  the TASER probes off of him and he unlocked his

14  arm from Glenn?  What did he do?

15          A      I believe that, as I explained a

16  moment ago, the answer is the same.  There was

17  laughing.  There was jocularity.  There was

18  comparing notes, basically, to "how did it feel

19  to you, how did it feel to you."  They were

20  discussing it and laughing about it.

21          Q      But you are talking about the

22  deputies, right?  I'm talking about Montoya.  Was

23  he laughing as well?

24          A      Yeah, mm-hmm.

25          Q      Did he say anything to anybody?

1    negative publicity it was going to cause his

2    administration.

3              Q     Did you actually talk to Sheriff

4    Walker?

5              A     For that moment in time, yes.  I

6    was in his office, with my head in my hand,

7    apologized to him for the negative press that was

8    bound to come.  And he thanked me and I turned

9    around and left.

10             Q     Did he say anything other than

11   "thanks" to your apology?

12             A     No, we didn't discuss it.

13             Q     Did he seem angry with you?

14             A     He did not.

15             Q     Do you think the fact that you

16   haven't taught any more TASER classes in the

17   Chaffee County jail is related to the Tommy

18   Montoya incident?

19             A     There are two reasons I

20   haven't -- that I believe are pertinent in this

21   situation.  The first is my business as a bail

22   bondsman in the area limits my time to do such

23   things.  Secondly, I recall a quote from Sheriff

24   Walker that next time, these classes would be

25   conducted with sheriff's department personnel.  I

1    don't expect him to change his mind on that.  He

2    made that quote publicly.  So I don't expect --

3              Q      Meaning he is going to do it

4    in-house, so to speak, have his own deputies do

5    the training?

6              A      And he has since done so.

7              Q      So your understanding is that he

8    has -- the Chaffee County jail has had subsequent

9    TASER training classes after October of '03?

10             A      I know the road officers have

11   because they have a road officer that is a

12   certified instructor.  And for the road officers

13   that carry the units, I don't know about the jail

14   personnel.

15             Q      How did you -- did you have to

16   arrange the meeting with Sheriff Walker?

17             A      I did not.

18             Q      Did you just walk into the jail

19   facility?

20             A      It was not the jail facility.  It

21   was his office.  His office is not in the same

22   building as the jail.

23             Q      Where is his office?

24             A      It is in the courthouse upstairs.

25   It's public access.  I walked in and he happened