04-0409

TAPED INTERVIEW 2-3-04
INVESTIGATOR LEONARD POST/THOMAS MONTOYA

EXHIBIT A-5

PRESENT:  LP:  INVESTIGATOR LEONARD POST
          TW:  SHERIFF TIM WALKER
          TM:  THOMAS MONTOYA

LP:  February 3, 2004, presently located at the Chaffee County Jail.

Mr. Montoya, for the record, please state your name.

TM:  I am Thomas Montoya.

LP:  Okay. And would you pull your seat up just a little closer to the mike so we can have little conversation.

My name is Leonard Post. I am an investigator with the District Attorney. Also present is Sheriff Tim Walker.

Mr. Montoya, as you and I discussed off of the tape, and I want to put it on the record – I want to say to you, you are not in trouble or under investigation for any criminal activity. I want – do you understand that?

TM:  Yes, sir, I do.

LP:  Okay. What we want to talk about, specifically, first, is we've learned that there's been some correspondence with the Denver Post, and, obviously, you were involved in a training class that went on in this facility. Is that true?

TM:  Yes, sir, it is.

LP:  Okay. When – when was the training class, do you remember?

TM:  I believe the training class was held October 17, 2003.

LP:  And where was it?

TM:  It was held here at the multi-purpose room.

LP:  Okay. Who all do you remember in attendance in that particular class?

Park-Chaffee 0131

1

TM: Well, with the instructor, I don't know his name. I think it was the same guy that runs a bonds – Triple A Bonds – but I'm not sure. I think it's Dave Platt is his name, but I'm not positive. Plus all the rest of the officers. Corporal Cole, all the officers that was here that was before the new officers – the new officers was only Officer Walker and Kailey is a new officer, but the rest of them are all – were all present.

LP: About how many people were in the class?

TM: Approximately eight, ten. Actually, it was an uneven number; that's probably nine.

LP: Nine. Give us a brief history. How did you become involved with that class?

TM: Well, I was standing outside watching the class, and everybody was – there was three or four of us trustees, and we were watching the class from the outside of the classroom, which is the multi-purpose room, and each of the officers were kneeling down on the air mattress, and they were being hooked up with the – the – an alligator clip to their shirt, and one on one side, and the officer on the other side on the back side, and they were holding hands, and they were kneeling down, and then they would be tazed and fall onto the mattress. And how I was involved in it is I was called in by an officer, and because there was not another officer to be his partner, so I was called in, and I emptied my pockets and took my glasses off and set them on the table, and I walked in, and I kneeled down on the mattress, and they put an alligator on my shirt – alligator clip on my shirt, and one on the officer, and they tazed me, and I got up and walked out of the class.

LP: Okay. So, when you were asked to participate in this class, do you know who – who asked you that?

Park-Chaffee 0132

2

TM: I don't want to get any officers in trouble. I think that the officers should be protected here also. Because

LP: Okay.

TM: it – it – it's not right for me to try and get another officer in trouble because, like I said before, I've been in the same situation.

LP: Okay. Was that the only time you were involved in – in the class participation? Or was there other classes?

TM: Yes. That was it.

LP: Was there other classes that you were aware of ever before?

TM: No.

LP: Okay. The other trustees, were they involved?

TM: No, just me.

LP: Okay. Who were the trustees that were standing outside? (Inaudible)

TM: Mm-hm. John Brandon. Milan – I don't remember Milan's last name. Pacheco. And I think that's all. I think us four were standing there at the time. I don't know if - excuse me – I don't know if – what's his name downstairs – I don't know if he's – he was a trustee yet or not.

LP: Okay.

TM: I think we were the four that were standing there. But I'm not . . .

LP: What I need to be real clear about, though, is is that you – you were asked by a member of the staff to participate, is that what you're saying?

TM: Yes.

LP: Did – did you ask – did you say to the staff member, can I do this?

TM: No.

LP: So he said to you, kind of – or he or she said to you, kind of be explicit. What was said? Did they order it, or did they ask you, or

TM: I was called to come into the classroom. I knew what was going on.

LP: Yeah, sure. I'm sure you did.

TM: I was called to enter the classroom by first name, and I – when I was called in, I came in and I was tazed.

LP: Okay. After you were tazed – had you ever been tazed before? Have you

TM: Not with a tazer like they have. I rode the react belt, and I've been – like I said, I was a correctional officer

LP: Yeah.

TM: for seven years. I've had the ultra – what do they call it – the stun tack. And I've used it on just training classes and stuff, myself, when I was a correctional officer.

LP: What injuries did you receive, if any, from this particular activity?

TM: There's no injuries. I mean, there's a – what they call a signature mark from being tazed, and any type of electronic device will . . .

LP: Did you have one?

TM: Yes.

LP: Where was it at?

TM: Right here.

LP: Okay. So what caused you to write the letter. I guess I'm just curious.

TM: What caused me to write the letter? Well, I don't think it was right that it ha – that that happened. But, also, there's more to it than that. And I'm – like I said, I'm gonna be truthful with you. I need some attention drawn to my case, and there's – I've been told that I needed some type of attention drawn to my case, and presently I can't afford an attorney because I've lost everything I own. And, somewhat I feel victimized, but not really. Because I've experienced it before. You know. So

LP: So what I'm hearing is is that your – your motive here for – for going to the public rather than to the sheriff is to get some attention drawn to your case partially

TM: Partially. Because I don't think anything would have – would have transpired anyway. And I still don't think that anything's going to transpire out of it. I mean, I've been involved on both sides of the law, and I know what happens, you know. Things are covered up. Just like me. I've been sentenced to 18 months, and I can prove my case. But nobody's going to listen to me. When I was a correctional officer, things happened, and they were covered up, and – and I know it happens.

LP: Well, were there any supervisors – let me – answer this for me. Were there any supervisors in that class from the level of sergeant up, or associated with this particular issue involving it.

TM: With being tazed?

LP: Yes, sir.

TM: No. There was no sergeant. And the lieutenant wasn't present. No.

LP: Do you know if the lieutenant was ever made aware of it prior to the day?

TM: I mentioned it to him.

LP: Did you?

Park-Chaffee 0135

5

TM: Yeah.

LP: Let's talk just briefly about that. What did you say? And when?

TM: I don't know exactly when – it was probably a couple of days after that, or somewhat – somewhere around there. I just told him I was tazed with the – during the class, and he just – he really didn't say nothing. He just – he was very busy at the time, and I didn't really make it a big issue. I didn't make it an issue. That's fine.

LP: But – but you told – is this Lieutenant Leva?

TM: Mm-hm.

LP: That you . . .

TM: I didn't mention it to him; I just said it to him. I didn't, you know . . .

LP: So was this in the form of a complaint, or was it in the form of conversation?

TM: Form of conversation.

LP: And he didn't say a word?

TM: He really didn't acknowledge. He - he might - he might have been have been busy and not, you know, really paying attention to me much.

LP: Okay.

TM: It wasn't – it wasn't a form of complaint.

LP: All right.

TM: I'll admit to that.

LP: Yeah.

TM: I like Lieutenant Leva. I don't want – you – and I like the officers here. I don't want any of them in trouble. I mean, for me, if I was the instructor of the class, and

I seen an inmate that was called in or whatever, I would have stopped the class. So I don't put it on the officers; I put it on the instructor. Point blank. That's basically what would have happened. If I was instructing a class and something was to go wrong to that nature, I would have stopped the class.

LP: Yeah.

TM: I would have enough

LP: But the instructor was in there when you got tazed. No question about it.

TM: The instructor is the one that tazed me.

LP: Okay. And do you have any questions?

TM: No.

LP: Okay. Now, what questions do you have of me? I'll give you the chance to ask me if any – if you – if you have any.

TM: Well, I don't think I have any questions.

LP: Okay.

TM: Basically, I knew this was going to come down. Okay, I do have a question. What can you do for me?

LP: With regard to - - your sentence? Or what?

TM: I don't want to be in jail.

LP: Well, I – nobody wants to be in jail.

TM: I don't think I should be here.

LP: And – what I can do for you, Mr. Montoya, is not tell you any lies, and I can say to you that if a judge sentenced you, on a mittimus, and there's a mittimus sitting in the box

Park-Chaffee 0137

7

TM: I have a mittimus – I have a copy of it.

LP: Then there's only one person in the world that can amend that mittimus, and that's the judge. So, you know, what we'll – anybody can do for anybody would be a little bit premature sitting in here. I don't – if you're in jail; if you're miscalculated, or if there's some legitimate issues that need to be reviewed, then either motions need to be filed, a hearing needs to be set, or whatever. And our office – I will tell our prosecutor what you're saying – that your issue needs to be some review – but Judge Alderton is the man that makes those decisions.

TM: Who's the prosecutor?

LP: Who – do you know who prosecuted your case? Was it Chip Cutler or was it Molly Walker?

TM: I'm not sure; I'd have to look on my . . .

LP: I don't know. I'm very unfamiliar with your case. I'll be frank with you.

TM: Mm-hm.

LP: But, but – go ahead

TW: I would like to tell you, as the Sheriff of Chaffee County, what I'm going to do for you to assure that, you know, that this doesn't happen again. I terminated Scott Glenn's employment about twenty minutes ago as a result of this, and I may be terminating Lieutenant Leva's employment here, as well. And I can assure you that, you know, if you have any problems like that, you need to come to me and let me know.

TM: I didn't want anybody to get terminated over this.

TW: We – we – we're not going to tolerate this kind of conduct to inmates.

TM: Like I said, I don't want anybody terminated over this.

Park-Chaffee 0138

8

TW: They're – they're done. Scott Glenn – we interviewed him; he's been terminated. You know, we're just not going to, you know, victimize you or anybody else in this facility. So

TM: I don't believe that that's right.

TW: Well, I – you know, I think you thought it was severe enough that you went to the Denver Post. And you're telling us that – that it's conduct, you know, unbecoming of – of – of – of the detention officers, and I agree with you.

TM: Well, whether – whether your detention officers had anything to do with this or not, the – the most responsibility that it lies on would be the instructor of that tazer class. Your instructor controls everything in that classroom.

TW: But you told me that a detention officer had brought you in. I know which one that is.

TM: I'd been called in.

TW: Right. And I know who that is. And we've investigated it; we did some interviews, and we determined that that was Scott Glenn. We're not going to tolerate that kind of – of, you know conduct in this facility. You know

TM: I understand that, after being . . .

LP: Apparently, you – you were either asked or there was some conversation prior to this day, though, what we've learned. Is that true? Like, can – can I be involved in the class as a model. Was – do – was there any conversation prior to the incident?

TM: I didn't even know the tazer class was going to transpire.

LP: Cause there was more than one class.

Park-Chaffee 0139

9

TM: I had offered my services as to different types of training that they were going to be involved with. And I was – I offered my help to assist them in things that I know about different types of training.

LP: I see. I see. Okay.

TW: So what we're – what we're getting at is there were several classes put on. It wasn't one big class. There were several tazer classes over a period of a month, I believe. In fact, I think there were three of them.

TM: The only class that I know if that transpired was the one that they called me in to. At that point time, and other than any other training class going on, I had no idea about.

TW: Mm-hm. Well, I want you to know if you have any problems, you know, I want you talk to me about that. You say that things like this get covered up. It's not getting covered up. We're – we – we're taking action already. I mean, we are uncovering this, if it was a cover-up, and we are taking the appropriate action. And we're not going to drop the ball on anything like this. You expressed problems with your probation. You know, if it's things related to the Sheriff's Department, we need to know so that we can take care of those problems.

TM: No, it's not related

TW: So

TM: to the Sheriff's Department. Basically, since all of this started with me, I've been pretty much railroaded. See, I know a little bit about the judicial system, but not very much. I've been pretty much railroaded the whole duration of this – this – this all started with me in 1999, and, basically, I can prove all my statements. But if certain

statements get out before I'm able to have an investigator investigate it and ask specific questions, then people won't be truthful. Okay?

LP: Have you spoken to the Public Defender about your issues?

TM: Oh, yeah. Public Defenders have done absolutely nothing for me.

LP: Well, maybe you need to speak with Legal Aid or somebody, too, Mr. Montoya, because we do have two issues here, and the Sheriff has hit on one. It's zero tolerance when a inmate at the Chaffee County Jail has any, and I mean any subjective - subjection to this kind of activity. Never happens. And you've been around, it looks like enough to know why.

TM: Mm-hm.

LP: So that's not gonna happen in this facility. Now, what our office does with it I can't speak with you, but I will mention to Molly Walker your complaints. They can pull it out of the file; I don't know what caused you to get here in the first place. See, you and I have never met, and – and I'm totally unfamiliar with this. And I do appreciate your honesty, but we've got to keep the two issues. Because you wrote the letter isn't going to mean you're going to get the key to get out of here.

TM: Yeah. I know.

LP: Do you understand – know what I mean?

TM: I understand

LP: Okay.

TM: I understand that completely.

LP: All right.

Park-Chaffee 0141

TW:   Just one last thing. If we pursue charges against a detention officer, will you be willing to prosecute?

TM:   Well, I – I – I said – like I said, I don't think he should lose his job.

TW:   That's already a done deal. So

TM:   I – I don't understand how you would be able to pursue any charges anyway because of the simple fact is

TW:   Well, there's a coercion factor there. You didn't know why you were going into the room when he asked you in. I'm getting a little bit of feeling that maybe you weren't very receptive to this. What was about to happen to you. You know, if that's true, there – there's a crime there.

TM:   You know, I'm not the type of person to burn people. And I don't want people

LP:   I don't know

TM:   burned over this.

LP:   Well, I – I know you don't want people to be hurt, and – and – and at the same time, we don't. What would have happened if this was at DOC?

TM:   Truthfully, lot of stuff probably would have happened over it.

LP:   Okay, then, the same issues. You know that, and so do I. I mean, we – we investigate those issues up there, too. So, it's – it's – it's ultra-serious. But I want to make sure it's a hundred percent in your mind, you were asked to go into the class.

TM:   Yes. Yes, I was asked.

LP:   And you – and you definitely told Mr. Leva a few days after, hey, I was tazed. No question in your mind?

Park-Chaffee 0142

12

TM: No.

LP: Okay. I'm going to end the interview.

It's

TM: Okay.

LP: one-twenty-five.

END OF INTERVIEW


Transcribed by Judy Starbuck

Park-Chaffee 0143