IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-02533-EWN-MJW

THOMAS MONTOYA,

      Plaintiff,

vs.

BOARD OF COUNTY COMMISSIONERS, CHAFFEE COUNTY, COLORADO, in their
official and individual capacities,
CHAFFEE COUNTY SHERIFF TIMOTHY WALKER, in his official and individual capacity,
CHAFFEE COUNTY DEPUTY SHERIFF SCOTT GLENN, in his official and individual
capacity,
DAVID PLATT, in his official and individual capacity,
BOARD OF COUNTY COMMISSIONERS, PARK COUNTY, COLORADO, in their official
and individual capacities,
PARK COUNTY SHERIFF FRED WEGENER, in his official and individual capacity.

      Defendants.
_____

**RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
_____

      Plaintiff Thomas Montoya, through his counsel, David A. Lane and Marcel Krzystek of

KILLMER, LANE & NEWMAN, LLP, hereby responds to *Defendants' Motion for Summary*

*Judgment* as follows:

## INTRODUCTION AND BACKGROUND

      This is an action for damages arising under the United States Constitution and the laws of

the State of Colorado.  Plaintiff alleges that Defendants violated the rights of Thomas Montoya

under the First, Fourth, Eighth and Fourteenth Amendments to the Constitution and the laws of

the State of Colorado when knowingly and with deliberate indifference to his constitutional

rights, they maliciously, wantonly and willfully forced Mr. Montoya to link his arms with

Defendant Scott Glenn and be subjected to a painful Taser shock.  David Platt, who was

contracted by Chaffee County to provided Taser training to jail deputies, applied a Taser device

on Mr. Montoya as part of the Chaffee County Sheriff's Taser training program, thereby causing

him extensive pain and suffering and physical injuries.  At no time was Mr. Montoya ever

informed what the effect of a Taser would have on him or that it would cause him pain and

injury.  At no time was he informed he had a choice as to whether or not to participate.

In addition to the claim alleging excessive force based upon the Taser incident occurring

on October 17, 2003[1], Plaintiff also alleges that a conspiracy began at that time because

Defendant Glenn and David Platt conspired to cause him pain and suffering.  Plaintiff further

claims that, when he complained of the mistreatment and alerted the media to it, the Defendants

conspired to punish him by transferring him to the Park County Jail where he was put into

punitive segregation.  Plaintiff claims that the conspiracy to Taser him and to punish him for

complaining began on October 17, 2003 and continued until on or about April of 2004.

Defendants' conduct under color of state law proximately caused the deprivation of

Plaintiff's federally protected rights.  Defendants' conduct, done willfully and wantonly, also

gives rise to punitive damages.  Furthermore, Plaintiff claims that Defendant Sheriff Walker is a

law enforcement supervisory officer who has failed to adequately or properly train or supervise

his officers in the use of force generally and specifically with the type of force used in this

matter.  Finally, Plaintiff claims that Defendant Sheriff Wegener housed Mr. Montoya in

punitive conditions as part of a conspiracy to help Sheriff Walker retaliate against him for

protesting his mistreatment in the Chaffee County Jail.  For all acts described above, Sheriffs

Walker and Wegener have "final policymaking authority" as that phrase is defined by *St. Louis*

---

[1] Defendants assert that Plaintiff was actually subjected to the Taser shock on October 16, 2003.  Plaintiff agrees that the exact date of occurrence is immaterial for purposes of Defendants' Motion for Summary Judgment.

*v. Praprotnik*, 485 U.S. 112, 123 (1988) and *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986) and their progeny.  Because Defendants Walker and Wegener are decision makers for Chaffee and Park Counties, respectively, and because the abuse of a Taser in this manner and retaliating against an inmate who protested the constitutional rights violation was done by policymakers for Chaffee and Park counties, the Chaffee and Park Counties are liable for the constitutional violations.

In his Complaint, Thomas Montoya asserts four claims for relief against Defendants 1) malicious, wanton and willful use of force in violation of the Fourth, Eighth and Fourteenth Amendments; 2) failure to provide medical care and treatment in violation of the Eighth Amendment[2]; 3) failure to train and supervise in violation of the Eighth and Fourteenth Amendment; 4) conspiracy in violation of the First, Fourth, and Eighth Amendments.

<u>**RESPONSE TO STATEMENT OF UNDISPUTED FACTS**</u>

1.    Admitted.

2.    Admitted.

3.    Admitted.

4.    Admitted.

5.    Admitted.

6.    Admitted that, with respect to jail deputies, being subjected to a Taser jolt is not mandatory for participation in the training session.  Denied that Mr. Montoya's participation in the training sessions, and the resulting Taser shock, was voluntary; Mr. Montoya perceived his participation to be a requirement pursuant to a verbal order.  *See* Exhibit 1, Montoya Depo., 131:14 – 132:17.

---

[2] Plaintiff agrees to voluntarily dismiss his claim based upon failure to provide medical care and treatment in violation of the Eighth Amendment.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.     Admitted.

11.     Admitted.

12.     Denied that Defendant Glenn was "preparing to be Tased alone."  Upon realizing that he would not have a partner, Defendant Glenn turned to Plaintiff and said: "Tommy, come in here and get tased with me."  Exhibit 1, Montoya Depo., 131:19 – 132:17.

13.     Admitted.

14.     Admitted.

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     Admitted that Sheriff Walker had no knowledge of Plaintiff's involvement in the training session until early 2004.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted that protection from retaliation was the proffered reason for the transfer.

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Admitted.

28.     Admitted.

29.     Admitted.

30.     Admitted.

31.     Admitted.

32.     Admitted that Plaintiff was provided medical care during his incarceration that was unrelated to the Tasering incident.

33.     Admitted.

34.     Admitted.

35.     Admitted.

36.     Admitted.

37.     Admitted.

38.     Admitted.

## STATEMENT OF ADDITIONAL DISPUTED OR UNDISPUTED FACTS

1.      In late January of 2004, Plaintiff contacted a Denver Post reporter, Sean Kelly, regarding the October 17, 2003 Tasering incident.  *See* Exhibit 1, Montoya Depo., 155:22 – 156:13.

2.      Sean Kelly's article about the Tasering incident, titled "Inmate Was Used for Taser Training,' was published in the Denver Post on February 4, 2004.  *See* Exhibit 2.

3.      Although a former DOC employee, Plaintiff had previously been incarcerated in general population for five months in Fremont County without incident.  *See* Exhibit 1, Montoya Depo., 176:9 – 177:3.

4.     Although a former DOC employee, and prior to his transfer to Park County, Plaintiff had previously been incarcerated in general population in Chaffee County without incident.  *See id*.

5.     While in the Park County jail, Plaintiff was subjected to far more severe conditions of confinement than in Chaffee County, including 23-hour per day lockdown in maximum security.  *See* Exhibit 1, Montoya Depo., 176:9 – 177:23.

## ARGUMENT

**I.     Plaintiff's Claims are not Barred by the Applicable Statute of Limitations**

*Defendants' Motion for Summary Judgment* is based in part upon the argument that all claims arising prior to December 14, 2003 are barred by the two year statute of limitations as set forth in C.S.A. § 13-80-102(g), *Wilson v. Garcia*, 471 U.S. 261 (1985), and *Workman v. Jordan*, 32 F.3d 475 (10th Cir. 1994).  However, the Tenth Circuit precedent relied upon by Defendants does not stand for the proposition that the continuing violation doctrine never applies in § 1983 conspiracy cases, and it does not establish that Defendants are entitled to the relief they seek.

First, *Hunt v. Bennett*, 17 F.3d 1263 (10th Cir. 1994) does not hold that the continuing violation doctrine cannot be applied to § 1983 cases; in fact, the case acknowledges that, in appropriate circumstances, a conspiracy claim may be asserted even if the conspiracy began at a point outside of the limitations period.  *See id*. at 1266.  ("Hunt cites no case in which a court has extended the continuing violation doctrine to a 1983 claim.  Nevertheless, we have held that an allegation of a conspiracy constitutes a viable claim under 1983, even if the alleged conspiracy began at a point that would be barred by the statute of limitations.  *See Robinson v. Maruffi*, 895 F.2d 649, 654-655 (10th Cir. 1990) (rejecting statute of limitations defense against 1983 claim alleging conspiracy to cause malicious prosecution)").  The plaintiff's claim failed however,

because he "fail[ed] to allege specific facts showing agreement and concerted action among

Bennett and the other defendants." *Id*. The plaintiff's claim failed because he failed to allege

facts evidencing a conspiracy, not because the Tenth Circuit declined to apply the continuing

violation doctrine to § 1983 cases.

Similarly, in *Pike v. City of Mission*, 731 F.2d 655 (10th Cir. 1984), the plaintiff's claims

did not fail because the Tenth Circuit declined to apply the continuing violation doctrine to §

1983 cases. There, the plaintiff filed suit as a result of alleged civil rights violations that arose

after his termination approximately five years prior to the filing of his complaint. *See id*. at 657.

The plaintiff argued that his claims "should be tolled both because defendants fraudulently

conspired to conceal their violations of his constitutional rights and because these violations are

continuing in nature." *Id*. at 658. With respect to the plaintiff's tolling argument, the Tenth

Circuit disagreed:

> Under Kansas law, fraudulent concealment does not toll the statute
> of limitations unless the plaintiff's claim for relief is grounded on
> fraud. . . . Pike's claims for relief are asserted under section 1983
> and are based on allegations of constitutional deprivations. They
> do not sound in fraud. Under Kansas law, therefore, Pike's
> allegations of fraudulent concealment would not prevent the
> running of the limitations period.

*Id*. at 658. The plaintiff also argued, with respect to his continuing violation theory, that his

claims were not time-barred because "defendants [] continued to deny him reinstatement and a

due process hearing, and [] continued to maintain employment records reflecting that he was

discharged for cause." *Id*. at 660. The Tenth Circuit disagreed, stating that "[t]hese acts are the

natural result of the original employment decision and are therefore not grounds for permitting

Pike to challenge defendants' time-barred conduct under the theory of continuing violation." *Id*.

Unlike *Pike*, Plaintiff in this case does not assert that the statute of limitations was tolled by

Colorado law.  Further, and more importantly for purposes of this Response, the retaliatory acts that flowed from Plaintiff's complaints about the Taser incident were *not* the natural result of the original constitutional violation.  By contrast, the actions were ongoing and continuing retaliation taken by Defendants against Plaintiff as a result of his complaints to jail officials and the media.

Particularly telling is the fact that the Tenth Circuit was recently presented with the opportunity to hold that the continuing violation doctrine does not apply to § 1983 cases but expressly refused to do so.  In the unpublished decision in *McCormick v. Farrar*, 147 Fed. Appx. 716, U.S. App. LEXIS 18801 (10th Cir. 2005) (attached as Exhibit 3), the Tenth Circuit decided a case factually similar to the case presently before this Court.  There, the plaintiff was arrested on January 22, 2000 by a defendant police officer and allegedly suffered injuries (including a broken thumb) as a result.  *See id*. at 718.  The plaintiff was also suffering from a fever at the time of the arrest.  *See id*.  During the trip to the jail, the defendant police officer refused the plaintiff's requests for medical attention, and told him that he would be charged with battery on a law enforcement officer and consequently would not be permitted to post bond until he saw a judge on Monday, January 24.  *See id*.  Once at the jail, the plaintiff alleged that the defendant police officer told four jail employees not to provide the plaintiff with any medical attention, and that those employees (also named defendants) "implicitly or expressly agreed to do so." *Id*.  The plaintiff alleged that he was kept in jail without any medical attention until he was brought before the judge at 5:00 p.m. on January 24, 2000.  *See id.*  In addition to his claim for unreasonable seizure, the plaintiff alleged that the defendants had engaged in a conspiracy to deprive him of medical attention.  *See id*.

The plaintiff filed his complaint on January 24, 2002, two years after the last day of the three day confinement.  *See id*. at 719.  Relying upon an unpublished Tenth Circuit decision, the

district court held that the plaintiff's claims were barred by the applicable two year statute of limitations because the continuing violation doctrine did not apply to § 1983 cases.  *See id*. at 719.  On appeal, the Tenth Circuit disagreed with the district court's reasoning and responded by stating that "[t]his court has not, however, announced a precedential blanket rule that the continuing violation doctrine is inapplicable to § 1983 suits."  *See id*.  The Tenth Circuit then went on to analyze the plaintiff's claims as if the continuing violation doctrine did apply. "Assuming, without deciding, that the continuing violation doctrine applies to § 1983 actions, the doctrine does not save any of McCormick's claims from being time-barred."  *Id*. at 720.  The reason the plaintiff's claims still failed was because "[t]o apply the continuing violation doctrine, there must be at least one act within the statutory filing period."  *Id*., *citing Furr v. AT&T Techs., Inc*., 824 F.2d 1537, 1543 (10th Cir. 1987).  The plaintiff, however, failed "to include any allegations in the deliberate indifference and conspiracy claims that any of the defendants acted on January 24, 2000."  *Id*.  Having failed to amend the complaint to allege such conduct within the limitations period, the plaintiff's claims were time-barred.  *See id*.

Here, Plaintiff specifically testified to having suffered retaliation, i.e., being held in protective custody, after his complaints of the Tasering incident to the media.  Plaintiff claims that, in retaliation for his complaint, Defendants Glenn, Platt, Walker, and Chaffee County transferred him to the Park County jail where he stayed for approximately five months.  (Five months would be mid-March, 2004.)  While in the Park County jail, Plaintiff was subjected to far more severe conditions of confinement than in Chaffee County, including 23-hour per day lockdown in maximum security, even though he was a prisoner on a probation violation and had a clean disciplinary record.

In sum, Defendants have failed to meet their burden of establishing that there exists no disputed material fact and that they are entitled to judgment as a matter of law.  Contrary to Defendants' argument that the continuing violation doctrine is inapplicable § 1983 cases, *McCormick* expressly held that the Tenth Circuit has never foreclosed such a possibility and in fact analyzed a similar case as if the doctrine did apply.  In light of *McCormick*, Defendants cannot find shelter under *Thomas v. Denny's, Inc.*, 111 F.3d 1506 (10th Cir. 1997), which addresses only claims brought under § 1981.  In addition, *Pike v. City of Mission* and *Hunt v. Bennett* are also unavailing to Defendants, as those cases were resolved under state law and on their facts, not pursuant to a holding that the continuing violation doctrine does not apply to § 1983 actions.

Finally, application of the continuing violation doctrine to § 1983 conspiracy cases would be in harmony with the application of the statute of limitations in criminal conspiracy cases.

> Conspiracy, the offense charged in count three of the indictment, is the prototypical continuing offense. . . . It is well established that, where an overt act is required for a conspiracy, the statute of limitations on a continuing conspiracy does not begin to run until the last overt act in furtherance of the conspiracy is committed.

*United States v. Jaynes*, 75 F.3d 1493, 1505 (10th Cir. 1996) (internal citations omitted)  "And for statute-of-limitations purposes, a non-overt-act conspiracy is not committed simply on the date the agreement is made but 'is deemed to continue as long as its purposes have neither been abandoned nor accomplished, and no affirmative showing has been made that it has terminated.'"  *United States v. Magleby*, 430 F.3d 1136, 1145 (10th Cir. 2005), *citing United States v. Arnold,* 117 F.3d 1308, 1313 (11th Cir. 1997).  Here, Plaintiff has testified that Defendants' retaliation and conspiratorial acts continued into April of 2004, well within the limitations period.  No affirmative showing has been made that the conspiracy was terminated

before that time, or that the conspiracy was accomplished or abandoned prior to that time.  There is no logical reason why the application of the statute of limitations in the criminal context should not apply with equal force in the civil § 1983 conspiracy context.

Because the retaliatory and conspiratorial acts of Defendants continued until March or April of 2004, Plaintiff's Complaint, which was filed within two years, was timely filed.

**II.     Plaintiff's Claims Against Park and Chaffee Counties**

Chaffee and Park counties, as "person[s]" and suable entities under 42 U.S.C. § 1983, are liable for the decisions of its municipal policymakers as such acts are deemed to be the "policy" of the counties.  *See Pembaur v. Cincinnati*, 475 U.S. 469, 481, 106 S. Ct. 1292, 1299, 89 L. Ed. 2d 452, 464 (1986) ("If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood.")  Municipal liability attaches where the final municipal policymaker "possesses final authority to establish municipal policy with respect to the action ordered."  *Id*.  "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law."  *Id*. at 482, 1300, 465.

"We conclude therefore that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers *or by those whose edicts or acts may fairly be said to represent official policy*, inflicts the injury that the government as an entity is responsible under § 1983.  *Monell, supra,* at 694 (emphasis added).  "If the sheriff's actions constitute county 'policy,' then the county is liable for them."  *McMillan v. Monroe County*, 520

11

U.S. 781, 783, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997), *citing Monell* at 694.  When determining

the liability of local governments under § 1983, this Court must ask whether a particular

governmental official is a final policymaker for the local government in a particular area, or on a

particular issue.  *See id*. at 785, 1737, 8, citing *Jett v. Dallas Independent School Dist., supra* at

737.  A state law can answer the question by, for example, simply labeling as a state official an

official who clearly makes county policy in the relevant area.  *See McMillan* at 786, 1737, 8.

Under Colorado state law, the sheriffs of Chaffee County and Park County are

"policymakers" for the counties with respect to issues relating to the housing, care, custody, and

well-being of inmates in their jail facilities.  *See* C.R.S. § 30-10-511 ("Except as provided in

section 16-11-308.5, C.R.S., the sheriff shall have charge and custody of the jails of his county,

and of the prisoners in the same, and shall supervise them himself or through his deputy or jailer,

for whose acts he and his sureties shall be liable.")  Because the sheriff is "responsible for

establishing final government policy respecting such activity," Chaffee and Park counties are

liable for their sheriffs' decisions and the consequences thereof.

Finally, Defendants' reliance upon *Bristol v. Board of Commissioners of Clear Creek*,

312 F.3d 1213 (10th Cir. 2004) is misplaced.  *Bristol* addressed the limited issue of whether or

not the board of county commissioners was the "employer" of a sheriff's deputy for purposes of

the Americans with Disabilities Act.  *See id*. at 1221 ("In sum, the Board had no duty as an

"employer" under the ADA to provide reasonable accommodation to Bristol.")  In fact, *Bristol*

supports Plaintiff's position in that it re-affirms the liability of a county for the civil rights

violations of a sheriff:

> Bristol also cites several cases from other circuits in support of his
> contention that the Board is his employer. Four of these cases
> involve § 1983 actions in which the acts of the Sheriff were held to
> set the "official policy" of the County, thus making the County

liable under § 1983 for the Sheriff's unconstitutional actions and those of the Sheriff's employees. *See Lucas v. O'Loughlin*, 831 F.2d 232, 233 (11th Cir. 1987) (termination in violation of First Amendment); *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986) (strip search); *Blackburn v. Snow*, 771 F.2d 556, 571 (1st Cir. 1985) (same); *Marchese v. Lucas*, 758 F.2d 181, 188-89 (6th Cir. 1985) (assault by deputies). These cases do suggest that counties can be held liable for the misdeeds of Sheriffs and their employees when the Sheriff is held to set "official policy" for the county.

*Bristol*, 312 F.3d at 1221.

For all of the above and foregoing reasons, Plaintiff has properly asserted his claims against Chaffee and Park counties, and Defendants' Motion seeking summary judgment on such basis must be denied.

### III.     The Individual Defendants are not Entitled to Qualified Immunity

### A.     Qualified Immunity Generally

The United States Supreme Court has recognized the tension between providing an important remedy for individuals injured by governmental officials' abuse of authority and subjecting such officials to the difficulties of litigation.  *See Anderson v. Creighton*, 483 U.S. 635, 638, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982).  In order to balance these competing interests, courts recognize the affirmative defense of qualified immunity, which protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986).

If a defendant asserts a qualified immunity defense, a two-part burden shifts to the plaintiff.  *See Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir. 2000); *Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995); *Albright v. Rodriquez*, 51 F.3d 1531, 1534 (10th Cir. 1995). First, the plaintiff must establish "that the defendant's actions violated a constitutional or

statutory right." *Albright*, 51 F.3d at 1534; *see also Wilson v. Layne*, 526 U.S. 603, 609, 143 L.

Ed. 2d 818, 119 S. Ct. 1692 (1999) (noting the court must first decide whether the plaintiff has

alleged deprivation of a constitutional right).   Second, the plaintiff must demonstrate that the

right at issue was clearly established at the time of the defendant's unlawful conduct.  *Albright*,

51 F.3d at 1534.  In determining whether the right was "clearly established," the court assesses

the objective legal reasonableness of the action at the time of the alleged violation and asks

whether "the right [was] sufficiently clear that a reasonable officer would understand that what

he is doing violates that right."  *Wilson v. Layne*, 526 U.S. at 615 (internal quotation marks

omitted).

        If the plaintiff successfully establishes the violation of a clearly established right, the

burden shifts to the defendant, who must prove "that there are no genuine issues of material fact

and that he or she is entitled to judgment as a matter of law."  *Hinton v. City of Elwood*, 997 F.2d

774, 779 (10th Cir. 1993).  Further, as is the standard for summary judgment generally, all

evidence must be viewed in the light most favorable to the nonmoving party. *See Nelson v.

McMullen*, 207 F.3d 1202, 1205 (10th Cir. 2000).

        Finally, it is unnecessary for Plaintiff to produce a factually identical case from the

United States Supreme Court or the Tenth Circuit in order to defeat Defendants' assertion of a

qualified immunity defense.  As the Supreme Court has held,

> [F]or a constitutional right to be clearly established, its contours
> "must be sufficiently clear that a reasonable official would
> understand that what he is doing violates that right. This is not to
> say that an official action is protected by qualified immunity unless
> the very action in question has previously been held unlawful.

*Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), *citing Mitchell v.

Forsyth*, 472 U.S. 511, 535, 86 L.Ed.2d 411, 105 S.Ct. 2806, n.12.  In *Hope*, the Supreme Court

pointed out that it had upheld convictions for criminal civil rights violations under 18 U.S.C. §§ 241 and 242 "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Hope* at 740.  "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances," and any requirement that previous cases be "factually similar" was "expressly rejected."  *Hope* at 741, *citing United States v. Lanier*, 520 U.S. 259 (1997).  Because Defendants had more than ample notice that subjecting an inmate to a Taser shock without justification and subsequently punishing him for his speech constituted constitutional violations, their motion seeking summary judgment must be denied.

### B.   Plaintiff States no Independent Fourteen Amendment Claim

Plaintiff asserts no independent Fourteenth Amendment substantive due process claim. His claims are brought pursuant to the Fourth and Eighth Amendments, which are incorporated into the Fourteenth Amendment.  *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1320 (10th Cir. 2002) ("I will first address the Fourth Amendment claim and then the Eighth Amendment claim. (To be precise, both claims are under the Fourteenth Amendment, which imposes on the states the substance of the Fourth and Eighth Amendments.)") (Hartz, J., dissenting, citing *Cooper Indus. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 433-34, 149 L. Ed. 2d 674, 121 S. Ct. 1678 (2001)).  References to the Fourteen Amendment in the First and Third claims for relief in the Complaint are references to the incorporation doctrine and are not intended to imply that separate claims for relief are sought under such amendment.

## C.       Plaintiff States a Cognizable Eighth Amendment Claim

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const. Amend. XIII.  "The Eighth Amendment's ban on inflicting cruel and unusual punishments, made applicable to the States by the Fourteenth Amendment, '[proscribes] more than physically barbarous punishments.' . . . It prohibits penalties that are grossly disproportionate to the offense, . . .  as well as those that transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'"  *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (internal citations omitted).  It is against this background that Defendants' claim of qualified immunity must be considered.

In a case such as this, a plaintiff must establish that the use of force employed against him was applied "maliciously and sadistically to cause harm" rather than in a "good faith effort to maintain or restore discipline."  *Hudson v. McMillian*, 503 U.S. 1, 6 – 7, 112 S. Ct. 995, 999, 117 L. Ed. 2d 156, 165 - 66 (1992).  Here, Plaintiff had committed no offense and there existed no reason to employ any force in an effort "to maintain or restore discipline."  Furthermore, clearly established law from the Supreme Court and clearly established weight of authority from other courts placed Defendants on notice that applications of force are constitutionally permissible only when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy, and not to force a nonviolent inmate to participate in a painful training session. Consequently, Defendants must be denied the qualified immunity defense they seek.

Defendant Scott Glenn personally participated in the Tasering incident by insisting that Mr. Montoya be Tased with him.  David Platt, the course instructor, pulled the trigger.  Even if Defendant Glenn did not pull the trigger, Tenth Circuit law holds that a law enforcement official who fails to prevent another law enforcement official's use of excessive force can be held liable

for failing to act under 42 U.S.C. § 1983.  *See Mick by and Through Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996), *citing Lusby v. T.G. & Y. Stores, Inc*., 749 F.2d 1423, 1433 (10th Cir. 1984) (officer who did not prevent fellow officer's use of allegedly excessive force against an arrestee "may be liable [under 1983] if he had the opportunity to intervene but failed to do so"), *vacated on other grounds*, 474 U.S. 805 (1985); *see also Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441-42 (11th Cir. 1985) ("It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983.  Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.")  Again, Glenn not only failed to stop the cruel and unusual punishment of Plaintiff, through threat or coercion he insisted on Mr. Montoya's active participation.

### D.   Defendants' Conduct Violated Clearly Established Law Regarding Cruel and Unusual Conduct

The use of force against Mr. Montoya was unconstitutional if applied "maliciously and sadistically to cause harm" rather than in a "good faith effort to maintain or restore discipline." *Hudson, supra*.  While the dividing line between malicious and sadistic conduct and good faith efforts to maintain or restore discipline is not precisely defined, "the amount of force that is constitutionally permissible . . . must be judged by the context in which that force is deployed." *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996).  Again, Mr. Montoya had done nothing whatsoever to justify the use of any force whatsoever.  Plaintiff could uncover no case suggesting or affirming the proposition that it is acceptable law enforcement or penal practice to shock a passive, non-resisting inmate with a high-voltage Taser gun simply to enable a deputy to participate in a training exercise.  The use of such literally overwhelming force against Mr.

Montoya in this circumstance clearly crossed the constitutional line and ventured well into the territory of malicious and sadistic.

1. <u>Claims Against Defendant Glenn</u>

It *Hickey v. Reeder*, 12 F.3d 754 (8th Cir. 1993), plaintiff Hickey, a convicted prisoner, instigated a confrontation with correctional officers that the Eighth Circuit described as follows:

> The incident began when Officer King ordered him to clean or to sweep his cell. Hickey, who was locked in the cell, refused. Officer King testified that he was "kind of belligerent" and "kind of stirred up," asserting that he did not have to listen to Officer King anymore because he had just been sentenced to the Arkansas Department of Corrections. Hickey said he would "whip [Officer King's] ass" if Officer King put the cleaning materials in his cell. Officer King summoned Corporal Carlton, hoping she could persuade Hickey to sweep the cell. She arrived with another officer and entered Hickey's cell to talk to him. . . . Corporal Carlton warned Hickey that if he did not voluntarily sweep his cell, the officers would make him do it. Hickey still refused to sweep. Deputy Martens also warned Hickey about the consequences of not sweeping his cell.
>
> Corporal Carlton then summoned Sergeant Reeder, who testified that he knew Hickey to be a difficult inmate. Sergeant Reeder arrived with three other officers and a stun gun. Hickey continued his refusal despite Sergeant Reeder's order to sweep his cell, and despite Sergeant Reeder's warning that the stun gun would be used if Hickey did not comply. Hickey told Sergeant Reeder he could beat, whip, or shoot him, but he was not going to sweep the cell. Sergeant Reeder then shot Hickey with the stun gun. Hickey slumped forward. After recovering from the shock, Hickey swept his cell. He continued carrying on, cursing, and threatening to sue the officers until the last officer left.

*Hickey*, 12 F.3d at 756. Hickey made two arguments with respect to why the guards' conduct violated his Eighth Amendment right. First, he argued "that the actions of the jail officials were an exaggerated and grossly disproportionate response to his misconduct." *Id*. Second, he argued "that the stun gun was used not to maintain discipline and restore order, but to punish him

summarily for being troublesome and to make an example out of him." *Id.* The court agreed

with Hickey on both counts. *See id.*

 The court first analyzed whether the defendants' conduct was sufficiently harmful, under

an objective standard, to establish an Eighth Amendment violation. *See id.* at 756 – 57.

> We note that every malicious push or shove does not amount to a
> deprivation of constitutional rights. Further, the pain maliciously
> inflicted must be significant for an Eighth Amendment violation to
> occur . . . However, as noted in *McMillian*, extreme pain can be
> inflicted with little or no injury. . . . We find defendants' attempt,
> on appeal, to minimize the pain of being shot with a stun gun by
> equating it with the pain of being shocked by static electricity to be
> completely baseless. The defendants' own testimony reveals that a
> stun gun inflicts a painful and frightening blow, which temporarily
> paralyzes the large muscles of the body, rendering the victim
> helpless. This is exactly the sort of torment without marks with
> which the Supreme Court was concerned in *McMillian*, and which,
> if inflicted without legitimate reason, supports the Eighth
> Amendment's objective component.

*Id.* at 757.

 After holding that defendants' conduct was objectively sufficiently harmful under the

Eighth Amendment, the court next turned its attention to the defendants' subjective state of

mind, i.e., whether the defendants' conduct constituted "the unnecessary and wanton infliction of

pain" as opposed to a good faith attempt to maintain or restore discipline. *Id.* The court did not

hesitate to hold that the defendants' conduct constituted the former.

> The district court relied on the defendants' testimony that Hickey
> was agitated and tense, pacing in his cell and waving his hands as
> he spoke, to find that the use of the stun gun was a good faith
> action to avoid violence. However, the defendants also testified
> that Hickey did not make any threats to physically assault them.[3]
> That the defendants feared violence is also belied by their actions
> after the use of the stun gun. The stun gun is intended to
> temporarily incapacitate a threatening person, and to give the

---

[3] The court noted that Hickey's initial remark to Officer King occurred before the other officers arrived and there
was no evidence that the other officers knew about it. The court further noted that Hickey did not react at all when
various officers opened and entered his cell. *See id.* at 757.

officers involved momentary advantage and a chance to neutralize
the threat.  When Sergeant Reeder applied the stun gun, there were
six or seven officers in and around Hickey's cell, but the officers
did not take advantage of Hickey's incapacitation to neutralize any
perceived threat to their safety.  At no time did they attempt to
remove, isolate, or restrain Hickey.

.

.

.

In view of all the testimony that Hickey had to sweep his cell or be
shot with the stun gun, and of Sergeant Reeder's own testimony
that he could do little else to Hickey for violating the rule because
of the impending transfer, the finding that the stun gun was applied
to Hickey because the officers feared that he might get violent is
simply not sustainable.  We can draw no other conclusion that that
the stun gun was used on Hickey to cause enough pain and harm to
force him to sweep his cell, and to make an example out of him.

*Id*. at 757 - 58.

Defendants in *Hickey* at least advanced the argument that the use of force was necessary

to achieve some objective, i.e., "to compel Hickey to sweep the floor after he had been ordered

to do so."  The court unequivocally and unambiguously rejected that argument, stating that it

"represent[ed] a fundamental misunderstanding of the law concerning the use of summary force

in prison settings.  The law does not authorize the day-to-day policing of prisons by stun gun."

*Id*. at 758 – 59.  While acknowledging that prison officials may compel compliance with

legitimate prison regulations, the court emphasized that its review of the law showed "that

summary applications of force are constitutionally permissible *when prison security and order,

or the safety of other inmates or officers, has been placed in jeopardy*."  *Id*. at 759 (emphasis

added)*, citing Whitley v. Albers*, 475 U.S. 312, 89 L.Ed.2d 251, 106 S.Ct. 1078 (1986) (riot and

hostage situation); *Jasper v. Thalacker*, 999 F.2d 353 (8th Cir. 1993) (direct attack on officer);

*Porth v. Farrier*, 934 F.2d 154 (8th Cir. 1991) (attack on officers from within a locked cell);

*Stenzel v. Ellis*, 916 F.2d 423 (8th Cir. 1990) (refusal to comply with security regulations); *Jones*

20

*v. Mabry*, 723 F.2d 590 (8th Cir. 1983) (escape attempt), *cert. denied*, 467 U.S. 1228, 81 L. Ed.

2d 878, 104 S. Ct. 2683 (1984); *Caldwell v. Moore*, 968 F.2d 595 (6th Cir. 1992) (prolonged

hysteria); *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988) (refusal to submit to strip

searches for weapons and contraband); *Soto v. Dickey*, 744 F.2d 1260 (7th Cir. 1984), *cert.*

*denied*, 470 U.S. 1085, 85 L. Ed. 2d 144, 105 S. Ct. 1846 (1985) (refusal to be handcuffed when

required for officers to safely enter a cell).

> The common thread running through all of the cases is a concern
> for the safety of the institution and for those within its walls.  We
> do not attempt to limit good faith applications of force where it is
> reasonably necessary to maintain the order and security of a penal
> institution, but summary force has yet to be ratified as the de jure
> method of discipline where security concerns are not immediately
> implicated. . . . We have not found, and hope never to find, a case
> upholding the use of this type of force on a nonviolent inmate to
> enforce a housekeeping order.
> .
> .
> .
> We do not presume to tell the Pulaski County Jail how to ensure
> compliance with their internal housekeeping regulations, but using
> a stun gun is not a constitutionally permissible option.  We find, as
> a matter of law, that the use of a stun gun to enforce the order to
> sweep was both an exaggerated response to Hickey's misconduct
> and a summary corporal punishment that violated Hickey's Eighth
> Amendment right to be free of cruel and unusual punishment.

*Id*. at 759. (emphasis added).

*Jolivet v. Cook*, 1995 U.S.App.LEXIS 3950 (10th Cir. 1995) (attached hereto as Exhibit

4), is consistent with all of the clearly established published law and confirms that shocking an

inmate with a Taser gun is not permissible unless there exists some threat to the security of the

facility or the safety of officers or other inmates.  Although that case offers little in the way of

Eighth Amendment analysis, it does state that the plaintiff refused to obey three orders to be

handcuffed so that he could be removed from his cell.  *See id*. at 3.

*Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988) leads to the same conclusion. There, the plaintiff was threatened (and not actually shocked) with a Taser gun after he refused to submit to a body cavity search. *See id*. at 335.  The plain language in that case makes it clear that subjecting an inmate to a Taser shock for a non-security related reasons constitutes an Eighth Amendment violation.

> The Supreme Court has said that administering electric shocks to prisoners as punishment for misconduct was "unusual."  *Hutto v. Finney*, 437 U.S. 678, 682, 57 L.Ed.2d 522, 98 S.Ct. 2565 (1978). There, guards in an Arkansas prison used the "Tucker telephone", a hand-cranked device, to administer electrical shocks to various sensitive parts of an inmate's body.  *Id*.  From the record before us, [defendant's] use of tasers is distinguishable.  The taser was used to enforce compliance with a search that had a reasonable security purpose, not as punishment.  The legitimate intended result of a shooting is incapacitation of a dangerous person, not the infliction of pain.

*Id*; *see also Shelton v. Angelone*, 183 F.Supp.2d 830, 835 (W.D.Vir. 2002) (holding that inmate stated a claim which survived summary judgment when he alleged being repeatedly shocked with a stun gun without justification while restrained in leg irons and handcuffs, finding that such conduct, if true, would be "repugnant to the conscience of mankind.")

Finally, applying *Hicks*, Senior Judge Richard P. Matsch denied a similar qualified immunity argument in a case where two jail deputies had Tasered an inmate who had thrown his tray to the floor and refused multiple orders to clean it up.  *See Preston v. Pavlushkin*, 03-cv-00617-RPM, *Order on Defendants' Motion for Summary Judgment* **[82]** (attached hereto as Exhibit 6):

> The deputy defendants claim that they are entitled to qualified immunity for their conduct in this use of restraining force. The parties agree that the finding of an Eighth Amendment violation requires that the evidence show that the officers went beyond a good faith effort to maintain or restore discipline and acted in a manner amounting to wanton and unnecessary infliction of pain.

> The motivation of the deputies must be evaluated with both objective and subjective elements.
>
> This case is comparable to *Hickey v. Reeder,* 12 F.3d 754 (8th Cir. 1993). The use of a Taser device is not, in itself, a violation of the Eighth Amendment. What supports the plaintiff's claim in this case is that the deputies used the device to enforce their order when they and the plaintiff inmate were the only occupants of the common area, the other inmates being closed in their cells. The only conduct of the plaintiff was his adamant refusal to comply with the order. He did not present any threat of physical violence. The device was used to shock him three times while he was on the ground and obviously incapacitated.

*Id*. at 3 – 4.

In light of the volume of clearly established Eighth Amendment law on the subject, Defendant Glenn's assertion of qualified immunity is without merit.  The issue is whether summary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has not been placed in jeopardy.  On this point, clearly established law from the Supreme Court, *Jolivet* and *Rubins*, and the clear weight of other circuit courts, serves to place Defendants on notice that it is not.  Again, there existed no situation confronting Glenn which would require the use of a Taser gun; there was no justification for subjecting Plaintiff to any use of force whatsoever.  Summary application of force is not permissible unless there exists some threat to the security of the facility of the safety of officers or other inmates.

In sum, Defendant Glenn used literally overwhelming force which constituted corporal punishment, without any justification whatsoever, that violated Plaintiff's Eighth Amendment right to be free of cruel and unusual punishment.  Based upon the state of the law as it existed on October 2003, Defendant was on notice that his conduct violated Mr. Montoya's clearly

established constitutional rights, and his motion seeking summary judgment based upon an assertion of qualified immunity must therefore be denied.

3.    Claims Against Defendants Walker and Wegener

Defendants Walker and Wegener are liable for the Eighth Amendment Constitutional deprivation suffered by Mr. Montoya because 1) the initial deprivation was directly caused by Defendant Walker's failure to train and supervise Defendant Glenn, and 2) Plaintiff's complaints about the deprivation led to retaliation and further deprivation during his incarceration at the Park County Jail.

With respect to the failure to train and supervise claim against Defendant Walker:

> [I]n light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. n10 In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412, 428 (1989). Presumably, situations in which jail deputies undergo training is routine. That jail deputies are not permitted to coerce jail inmates into participating in painful training exercises should be obvious. Consequently, the need for training is obvious and the failure of supervisory officials and the county to provide the necessary training constitutes an Eighth Amendment violation.

Sheriff Walker has the ultimate responsibility for ensuring that jail staff are properly trained to comply with constitutional requirements and is a "policymaker" for Chaffee County. The identification of policymaking officials is a question of state law. "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an

official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Pembaur v. Cincinnati*, 475 U.S. 469, 483, 106 S. Ct. 1292, 1299, 89 L. Ed. 2d 452, 464 (1986).  Here, Sheriff Walker, as the sheriff of Chaffee County, was the county official possessing final policymaking authority with respect to the custody and medical care of all inmates at the Chaffee County Jail.  *See* C.R.S. § 30-10-511 ("Except as provided in section 16-11-308.5, C.R.S., the sheriff shall have charge and custody of the jails of his county, and of the prisoners in the same, and shall supervise them himself or through his deputy or jailer, for whose acts he and his sureties shall be liable.")  Because Sheriff Walker and Chaffee County failed to train its jail staff with respect to the appropriate use of Tasers, and because that failure was the direct result of the Constitutional deprivation suffered by Mr. Montoya, sheriff Walker's motion for summary judgment must be denied.

With respect to Sheriff Wegener, it is not disputed that, after his transfer to the Park County Jail, Mr. Montoya was placed into protective custody where he was in lockdown 23 hours per day for seven days per week.  The articulated reason for placing Mr. Montoya in protective custody was the fact that Mr. Montoya had, prior to his incarceration, been an employee of the Department of Corrections.  However, prior to his arrival at the Park County Jail, Mr. Montoya had previously been incarcerated in general population for five months in Fremont County without incident.  *See* Exhibit 1, Montoya Depo., 176:9 – 177:3.  Even in Chaffee County, Mr. Montoya had been incarcerated in general population without incident.  *See id*.  While in the Park County jail, Plaintiff was subjected to far more severe conditions of confinement than in Chaffee County, including 23-hour per day lockdown in maximum security. *See* Exhibit 1, Montoya Depo., 176:9 – 177:23.  Based upon that, a reasonable jury could

conclude that the conduct of Park County and its Sheriff was motivated by the desire to retaliate against Mr. Montoya for his criticism of his forced participation in the Taser training exercise.

## IV. Plaintiff's Conspiracy Claim

Due to the secretive nature of conspiracies, proving their existence is difficult and direct evidence may be impossible to obtain.  As one circuit has pointed out, determining whether the evidence is sufficient to support a conviction for aiding and abetting in a drug distribution case "'is difficult if not impossible.'"  *United States v. Ledezma*, 26 F.3d 636, 641 (6th Cir. 1994), *quoting United States v. Winston*, 687 F.2d 832, 834 (6th Cir. 1982).  In a recent Tenth Circuit decision, a defendant, convicted of criminal conspiracy to commit tax evasion, argued that there was a lack of evidence to support his conviction.  *See United States v. Pursley*, ___ F.3d ___ (10th Cir. 2007) (attached hereto as Exhibit 5).

> Alternatively, [defendant's] argument could be that direct evidence showing a connection between himself and each of the nine inmates listed on the tax returns was necessary for a conviction. He could be contending that such a showing is required for a reasonable jury to believe his involvement in the preparation of the first six tax returns (for which he concedes evidence exists) extended to the preparation of the remaining thirteen tax returns. Such an argument is wrong.  It is well established that the government need not prove its case by direct evidence alone.  *See, e.g., United States v. Young*, 954 F.2d 614, 618 (10th Cir. 1992) ("**Because criminal conspiracies by their nature are generally secret, often carefully concealed and may even be unarticulated, conspiracy may be found based solely upon circumstantial evidence**.")

*Id*. (emphasis added)  The same principles apply to civil conspiracies.  "A plaintiff can prove a conspiracy with either direct or circumstantial evidence."  *Lantec, Inc. v. Novell, Inc*., 306 F.3d 1003, 1028 (10th Cir. 2002), *citing American Tobacco Co. v. United States*, 328 U.S. 781, 809-10, 90 L. Ed. 1575, 66 S. Ct. 1125 (1946).

Again, it is not disputed that, after his transfer to the Park County Jail, Mr. Montoya was placed into protective custody where he was in lockdown 23 hours per day for seven days per week.  The articulated reason for placing Mr. Montoya in protective custody was the fact that Mr. Montoya had, prior to his incarceration, been an employee of the Department of Corrections. However, prior to his arrival at the Park County Jail, Mr. Montoya had previously been incarcerated in general population for five months in Fremont County without incident.  Even in Chaffee County, Mr. Montoya had been incarcerated in general population without incident. While in the Park County jail, Plaintiff was subjected to far more severe conditions of confinement than in Chaffee County, including 23-hour per day lockdown in maximum security. Based upon that circumstantial evidence, a reasonable jury could conclude that the conduct of Park County and its Sheriff was motivated by the desire to retaliate against Mr. Montoya for his criticism of his forced participation in the Taser training exercise, and that Park County acted in concert with Sheriff Wegener and/or other Chaffee County officials in a conspiracy to deprive Mr. Montoya of his constitutional rights.

## **CONCLUSION**

For all of the above and foregoing reasons, Plaintiff respectfully requests that Defendants' Motion for Summary Judgment be denied.

Respectfully submitted this 15th day of February, 2007.

KILLMER, LANE & NEWMAN LLP

s/ David A. Lane
_____
David A. Lane
Marcel Krzystek
1543 Champa St., Suite 400
Denver, Colorado 80202
(303) 571-1000
dlane@killmerlane.com

mkrzystek@killmerlane.com
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

- **Edmund Martin Kennedy**
  kennedye@hallevans.com wilsonm@hallevans.com;cmecf@hallevans.com
- **Anthony Melonakis**
  a_melonakis@hotmail.com
- **Andrew David Ringel**
  ringela@hallevans.com troutl@hallevans.com;cmecf@hallevans.com

KILLMER, LANE & NEWMAN, LLP

s/ Marcel Krzystek
_____
Marcel Krzystek
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
Telephone (303) 571-1000
mkrzystek@killmerlane.com