```
 1           IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLORADO

 3   Civil Action No. 05-cv-02533-EWN-MJW

 4   THOMAS MONTOYA,

 5        Plaintiff,

 6   vs.

 7   BOARD OF COUNTY COMMISSIONERS, CHAFFEE COUNTY,
     COLORADO, CHAFFEE COUNTY SHERIFF TIMOTHY WALKER,
 8   CHAFFEE COUNTY DEPUTY SHERIFF SCOTT. GLENN, DAVID PLATT,
     BOARD OF COUNTY COMMISSIONERS, PARK COUNTY, COLORADO,
 9   PARK COUNTY SHERIFF FRED WEGENER,

10        Defendants.
     _____
11
               DEPOSITION OF THOMAS MONTOYA
12                    July 24, 2006
     _____
13

14   APPEARANCES:

15   FOR THE PLAINTIFF:         MARCEL KRZYSTEK, ESQ.
                                Killmer, Lane & Newman, LLP
16                              1543 Champa Street
                                Suite 400
17                              Denver, CO  80202

18   FOR THE DEFENDANTS,        ANDREW D. RINGEL, ESQ.
     BOARD OF COUNTY            Hall & Evans, L.L.C.
19   COMMISSIONERS OF CHAFFEE   1125 Seventeenth Street
     COUNTY, TIMOTHY WALKER     Suite 600
20   BOARD OF COUNTY            Denver, CO  80202
     COMMISSIONERS OF PARK
21   COUNTY and FRED WEGENER:

22   FOR THE DEFENDANT,         ANTHONY MELONAKIS, ESQ.
     CHAFFEE COUNTY DEPUTY      Law Offices of Anthony
23   SHERIFF SCOTT GLENN:           Melonakis
                                1660 Wynkoop
24                              Suite 800
                                Denver, CO  80202
25
```

CARPENTER REPORTING, INC.
(303) 752-1200

Page 129

1  Q  Okay. How long after lunch was it, if
2  you know?
3  A  How long was it after lunch for what?
4  Q  For -- that the training started.
5  A  Well, they take lunch and then come back
6  in and start training, I guess, at 1.
7  Q  Was there any kind of count after lunch
8  in the Chaffee County jail?
9  A  I wouldn't know for positive.
10 Q  Okay. I mean, back to your experience
11 at the DOC, I understand that the DOC, in most of its
12 facilities, does two kinds of counts. One is a formal
13 count where the offender would have to essentially
14 respond to an officer to say I'm here; right?
15 A  Yes.
16 Q  And then another is an informal count
17 that might occur at different types of -- times of the
18 day, including when the offenders are sleeping; right?
19 A  Yes.
20 Q  Where the -- where the people that are
21 counting would make visual contact with every inmate
22 that was in the facility; right?
23 A  Yes.
24 Q  Okay. Presumably, the Chaffee County
25 jail does some kind of counts every day; right?

Page 130

1  A  Presumably, yes, I guess. Yeah. That
2  would be --
3  Q  What -- one of the -- one of the jobs of
4  correctional officers or detention officers is to make
5  sure that everybody who's supposed to be in the
6  facility is in the facility; right?
7  A  Yes.
8  Q  Okay. What do you remember about the
9  counts during the day at the Chaffee County jail?
10 A  What do I remember about the counts?
11 Q  How many were there? When they
12 occurred? What you had to do to be counted?
13 A  I don't really recall. I mean ... I
14 remember, in the old jail, one of the officers would
15 walk through and count, but I think they done mostly
16 like informal counts, but I'm not positive.
17 Q  I mean, did you ever have to stand up by
18 your cell door to be counted at any particular time in
19 the jail on a daily basis?
20 A  Not that I can recall.
21 Q  And as a trustee, were you just counted
22 wherever you happened to be at the time?
23 A  Yes. That's why I don't know a whole
24 lot about counts.
25 Q  So there wasn't a count that you know

Page 131

1  about after lunch where everybody had to go back to
2  their cells to be counted?
3  A  No.
4  Q  That kind of thing would happen at Buena
5  Vista, right, that everyone at some times of the day
6  would have to go back to their cells and be counted;
7  right?
8  A  No.
9  Q  No.
10 A  If an inmate has a job over at another
11 place within the facility -- like we had leather
12 shop -- he would be counted by those people at a
13 specific count time.
14 Q  Okay. That makes sense. All right.
15 Back to the day of the taser incident. Describe for me
16 how it was that you entered the training room.
17 A  Describe for you how it was that I
18 entered the training room?
19 Q  Yeah. What happened that led you to
20 enter the training room?
21 A  As I said, Scott Glenn -- Officer Scott
22 Glenn didn't have a training -- a partner to be tased
23 with.
24 Q  Okay.
25 A  And I was standing outside the door,

Page 132

1  outside the training facility. And Officer Glenn
2  turned to me and said, "Tommy, come in here and get
3  tased with me."
4  Q  Okay.
5  A  And he opened the door for me, and I
6  entered the classroom.
7  Q  Okay. Did you perceive Mr. Glenn's
8  asking you to be -- to participate in the tasing to be
9  an order from a detention officer to you as an inmate?
10 A  Did I perceive it as an order?
11 Q  Yeah.
12 A  Yes. I would have to. It's a verbal
13 command.
14 Q  Okay. So you -- you believe that
15 Officer Glenn was ordering you, as an inmate, to
16 participate in a taser exercise?
17 A  Yes.
18 Q  Okay. Was there any communication
19 between Officer Glenn and anyone else in the training
20 room about you participating in the training exercise
21 before he made the statement that you just described?
22 A  Did he discuss it with other officers
23 about bringing me into the classroom? Is that what
24 you're asking?
25 Q  Right.

Page 153

1　A　Some. Some.
2　Q　How did you spend that money?
3　A　A little bit on canteen. I didn't have
4　very much money and I don't -- you know, I don't know
5　if they paid me or not while I was in Salida. I'm not
6　sure. I know they did in Park County, what little bit
7　I did for them. But I don't know if Salida did or not.
8　I know Park County did because I think I had $32 when I
9　came back.
10　Q　Do you know how much it would have been
11　to go see the doctor?
12　A　I don't know.
13　Q　Okay.
14　A　At the time, they had told me, but I
15　don't recall.
16　Q　Was it a lot?
17　A　No. Compared to seeing the doctor out
18　here compared to seeing a doctor in there, yeah, it's
19　cheap, but if you don't have money, you don't have
20　money.
21　Q　I understand. Okay. Let me see if I'm
22　clear. I mean, you believe you told a nurse that you
23　had headaches because you had been tased; is that
24　right?
25　A　Yes.

Page 154

1　Q　Okay.
2　A　She asked me why I had headaches, and I
3　told her I wasn't for sure, but this occurred and that
4　would be the only incident that would cause something
5　like that, I would think.
6　Q　And did she react in any other way after
7　you imparted this information to her?
8　A　She just gave me Tylenol and would make
9　sure -- she was nice. She would ask me if I had a
10　headache and if I would need Tylenol pretty much on a
11　daily basis.
12　Q　And whenever you wanted Tylenol, she
13　gave it to you?
14　A　Yes.
15　Q　Did the Tylenol help your headaches?
16　A　Some. It tore my stomach up, but ...
17　Q　Okay. Do you recall any other specific
18　interactions you had with anyone with medical at the
19　Chaffee County jail?
20　A　No. Not to my knowledge.
21　Q　Did you ever discuss with Sheriff Walker
22　the issue of medical care at the Chaffee County jail?
23　A　Not to my knowledge.
24　Q　Did you ever discuss with any member of
25　the Board of County Commissioners of Chaffee County the

Page 155

1　issue of medical care at the Chaffee County jail?
2　A　I don't believe so, because I probably
3　never seen them.
4　Q　Do you know who the members of the Board
5　of County Commissioners of Chaffee County were at the
6　time you were incarcerated in the Chaffee County jail?
7　A　No, sir, I don't.
8　Q　Did you ever fill out a request to see
9　medical during the time that you were in the Chaffee
10　County jail?
11　A　Yes. Yes, I did.
12　Q　Okay. How many times?
13　A　I can't be positive. Not very much. I
14　don't -- don't do doctors very well.
15　Q　Do you remember what the reason was that
16　you wanted to see medical?
17　A　Because of my headaches.
18　Q　In the request to see medical, do you
19　recall whether or not you included that you thought
20　your headaches were related to the taser incident?
21　A　I don't believe so.
22　Q　Okay. All right. At some point, you
23　have a conversation with a reporter from the Denver
24　Post; right?
25　A　Yes.

Page 156

1　Q　Okay. A fellow named Sean Kelly?
2　A　Yes.
3　Q　Okay. How did you get into contact with
4　Mr. Kelly?
5　A　Telephone.
6　Q　Okay. You just called the main number
7　at the Denver Post?
8　A　Yes.
9　Q　Okay. When did that conversation occur?
10　A　I'm not positive.
11　Q　Okay. Does the date January 28th,
12　2004, sound right to you?
13　A　I can't be positive.
14　Q　Okay. What made you decide to call The
15　Denver Post?
16　A　What made me decide to call The Denver
17　Post? I thought about what they did and that they
18　didn't give me any medical attention. And I probably
19　discussed a little bit with my cellie, my roommate, and
20　he probably told me that they can't do that type of
21　stuff and that I should tell somebody. So I don't even
22　know what gave me the idea to contact him.
23　Q　Did you contact Mr. Kelly specifically,
24　or did you just kind of call the main number of the
25　Denver Post and say, I want to talk to a reporter about

Page 173

1 was an investigator for the District Attorney; right?
2    A   11th Judicial District, yes.
3    Q   Okay. Other than Mr. Post, did you
4 speak to anyone else that was affiliated with the
5 District Attorney of the 11th Judicial District about
6 the taser incident?
7    A   I think I wrote Molly Walker a letter,
8 the District Attorney.
9    Q   Okay.
10   A   And I think it was a general letter to
11 the District Attorney. I don't know if I knew her at
12 the time --
13   Q   Okay.
14   A   -- per se. And I just -- I think, in
15 the letter, I explained what happened and I would like
16 to try and press charges.
17   Q   Was it before or after this letter
18 that's Exhibit 14?
19   A   Before.
20   Q   Okay. Do you have a copy of that
21 letter?
22   A   I'm not positive. I would have to dig
23 through all my stuff.
24        MR. RINGEL: I haven't seen that letter,
25 but I don't know if either of you have.

Page 174

1         MR. MELONAKIS: No.
2         MR. RINGEL: Marcel, if you could see if
3 Mr. Montoya can find that letter, that would be great.
4         MR. KRZYSTEK: Well, I can ask again,
5 but we went through all the documents, I think, that
6 he's got relevant to this case --
7         MR. RINGEL: Okay.
8         MR. KRZYSTEK: -- and I didn't see
9 anything like that. Otherwise, I would have produced
10 it.
11        MR. RINGEL: I believe you.
12        THE DEPONENT: Some of it I brought you
13 today is kind of scattered.
14        MR. RINGEL: Okay.
15        MR. KRZYSTEK: Nothing he brought today
16 is responsive to what -- the subject of your inquiry
17 right now.
18        MR. RINGEL: I understand. That's fine.
19 All right. Well, if you come across it, give it to
20 Mr. Krzystek or Mr. Lane and they will make sure they
21 forward it to me, but -- and Mr. Melonakis. If you
22 don't have it anymore, you don't have it anymore.
23 That's the way life works sometimes. Okay.
24   Q   (BY MR. RINGEL) All right. Other than
25 that, did -- did you ever receive anything from

Page 175

1 Ms. Walker in writing other than Exhibit 14?
2    A   I don't think so.
3    Q   Okay. Did you ever have a conversation
4 with anyone at the Park County jail about why you were
5 transferred from the Chaffee County jail to the Park
6 County jail?
7    A   Conversation in why I was transported?
8    Q   Transferred. Right.
9    A   Transferred. Probably some of the
10 officers there questioning them.
11   Q   Okay.
12   A   Specifics, I don't recall. I was trying
13 to find out why I was there.
14   Q   Okay.
15   A   I didn't know.
16   Q   Okay. Do you remember the names of any
17 officer that you had a conversation with about why you
18 were there or why you ended up from the Chaffee County
19 jail to the Park County jail?
20   A   Truthfully, I can't remember, probably,
21 maybe one of their names. It's only because I read it
22 on the paper.
23   Q   Okay.
24   A   I'm sorry.
25   Q   That's okay. Do you remember having a

Page 176

1 conversation with Sergeant Muldoon about that topic?
2    A   I recall Sergeant Muldoon. To recall a
3 conversation, I -- I can't say yes or no, honestly.
4    Q   Do you recall any conversation that you
5 might have had with Sergeant Muldoon during the time
6 that you were incarcerated in the Park County jail?
7    A   No. Honestly, I can't be specific and
8 be truthful.
9    Q   Okay. I understand. Do you recall ever
10 having a conversation with Captain Gore during the time
11 that you were incarcerated in the Park County jail?
12   A   Yes. Yes, I do.
13   Q   Okay. Do you recall anything that you
14 talked to Captain Gore about at any time?
15   A   Why I was locked down 23-7.
16   Q   Okay. And what did Captain Gore tell
17 you?
18   A   Because I'm an ex-correctional officer
19 and because he's trying to protect me.
20   Q   Okay. Did that make sense to you?
21   A   No.
22   Q   Why?
23   A   Because I was in general population in
24 Fremont County for five months and everybody knew it
25 there -- that I was a correctional officer -- and

Page 177

1 nothing happened. I was in general population and a
2 trustee with constant contact with all the other
3 inmates in Salida and never really had any problems.
4    Q  Okay.
5    A  And then I got shipped to Park County
6 and I really didn't do anything, I don't think, to
7 deserve to be locked down 23 hours a day. And I was
8 never explained why. I've written kites about it,
9 but --
10   Q  Okay. Well, wasn't Captain Gore telling
11 you that it was for your own protection, an explanation
12 of why?
13   A  Yes.
14   Q  But you didn't agree with that decision?
15   A  Why -- well, first of all, why would
16 they ship me to Park County when I live in Fremont
17 County and had already spent five months in Fremont
18 County? Why would they not send me back to where I
19 came from and my home? Instead, they send me to Park
20 County, 300 miles away from my family --
21   Q  Okay.
22   A  -- you know, and then they locked me
23 down 23 hours a day. And what did I do, you know?
24   Q  During the time that you were in the
25 Fremont County jail, were there inmates there that had

Page 178

1 been sentenced to the Colorado Department of
2 Corrections?
3    A  I'm sure there was.
4    Q  Okay. You are aware that inmates that
5 had been sentenced to the Colorado Department of
6 Corrections were housed at the Park County jail at the
7 time that you were incarcerated there; right?
8    A  Yeah. I knew some DOC inmates were
9 there.
10   Q  Okay. Do you think it matters whether
11 there was a DOC inmate there in terms of your safety as
12 a former DOC correctional officer, or do you think that
13 it doesn't matter at all?
14   A  I wouldn't think that it mattered a
15 whole lot. When I first got to Park County, they did
16 put me in general population for a little bit.
17   Q  Okay.
18   A  Then that newspaper article came out,
19 and they locked me down.
20   Q  Okay. Well, the newspaper article
21 indicates that you were a former Department of
22 Corrections officer; right?
23   A  Yes.
24   Q  And the Denver Post would have been
25 available to the inmates at the Park County jail;

Page 179

1 right?
2    A  Yes. But that was -- that's not new
3 information to Freemont County, Chaffee County, or --
4 that I done general population time in.
5    Q  Okay. Well, do you believe that had you
6 been sentenced to the Department of Corrections, that
7 you would have been safe being an inmate, say, at the
8 Buena Vista correctional facility?
9        MR. KRZYSTEK: Object to the form. You
10 can answer if you can.
11   A  Would I think that I would be in
12 jeopardy?
13   Q  (BY MR. RINGEL) Right.
14   A  There actually is no such thing as P.C.,
15 protective custody, in DOC. There is no thing -- no
16 such thing.
17   Q  I understand that.
18   A  As for my protection, I don't think an
19 officer inside a jail can protect any inmate.
20   Q  Okay. But do you think that, as a
21 former correctional officer in the Department of
22 Corrections system, if you happen to have been
23 incarcerated in a Department of Corrections facility,
24 that you might be more of a target than other inmates?
25   A  How could I say that? I don't know.

Page 180

1    Q  Okay. Were you aware, during the time
2 that you were a correctional officer at the Department
3 of Corrections, of anyone who was a former correctional
4 officer being incarcerated at a Department of
5 Corrections facility?
6    A  Police officers.
7    Q  But -- but Department of Corrections
8 officers?
9    A  The Department of Corrections like I
10 was?
11   Q  A former --
12   A  DOC --
13   Q  Right. A former DOC correction officer,
14 being incarcerated after being convicted of a crime in
15 a DOC facility. Are you aware of that circumstance
16 ever occurring?
17   A  I'm not positive that it would have
18 occurred, but I've been told that that -- that it
19 doesn't matter. And I seen while I was an officer,
20 there was a police officer that was incarcerated in a
21 State facility.
22   Q  At CSP or at Buena Vista?
23   A  Buena Vista.
24   Q  Okay. In general population?
25   A  Yes, sir.